**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ILEANA DIAZ,

               Plaintiff,

        v.

TRANSATLANTIC REINSURANCE COMPANY,

           Defendant.

Docket No. 16-CV-1355

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Ileana Diaz, by and through her attorneys at the Filosa Law Firm, PLLC, as and for her Complaint in this action against Transatlantic Reinsurance Company ("TransRe," the "Company," or "Defendant") alleges as follows:

## PRELIMINARY STATEMENT

1.     This is an action seeking declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendant's violations of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Pub. L. No. 111-203, 124 Stat. 1376 (2010), the Family & Medical Leave Act, 29 U.S.C. §§ 2601 *et seq*. ("FMLA"), the New York State Human Rights Law ("State Human Rights Law"), N.Y. Exec. Law §§ 290 *et seq.*, the New York City Human Rights Law ("City Human Rights Law"), N.Y. Admin. Code §§ 8-101 *et seq.*, as well as the common law.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to 15 U.S.C. § 78u-6(h)(1)(B)(i) and 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

3.      The Court also has jurisdiction over Plaintiff's claims under state and local law pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between Plaintiff, a citizen of the State of New Jersey, and Defendant, a citizen of the State of New York and this action involves a matter in controversy that exceeds the sum or value of $75,000, exclusive of interest and costs.

4.      Venue is proper in the district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this district because and, at all relevant times, Defendant's principal place of business was located in this district.

## PARTIES

5.      Plaintiff Ileana Diaz is a current employee of TransRe and is a resident of the State of New Jersey. At all relevant times, Plaintiff met the definition of "employee" under all applicable statutes.

6.      Defendant TransRe is a domestic business corporation, organized and existing under the laws of the State of New York with a principle place of business located in the New York, NY. Defendant TransRe is a wholly-owned subsidiary of Transatlantic Holdings, Inc., which is itself a wholly-owned subsidiary of Alleghany Corporation ("Allegheny"), a publicly held corporation that issues multiple classes of securities required to be registered under the Section 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78 et seq., and is required to file reports under Section 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(d).

## FACTUAL ALLEGATIONS

### Plaintiff's Employment with Defendant

7.      Plaintiff is a current employee of TransRe and has been employed by Defendant for more than nine years.

8.      Defendant hired Plaintiff as a Senior Reinsurance Claims Examiner in July 2006.

9.      In September 2013, Defendant promoted Plaintiff to the position of Assistant Manager in Defendant's Claims Department with responsibility for management of Defendant's 1985 and Prior Claims unit ("1985 & Prior").

10.     In this position, Plaintiff reported to Robert Rosen, Claims Manager, who in turn reported to Beth Levene, Executive Vice President and Defendant's Chief Claims Officer. Ms. Levene's responsibility also included oversight of Defendant's Human Resources department.

11.     With her promotion, Plaintiff was put in the precarious position of managing and supervising the work of a number of Ms. Levene's family members. Specifically, Plaintiff was responsible for supervising work performed for Defendant by the following individuals:

        a.      Wesley Sherman: Mr. Sherman is a cousin of Ms. Levene's husband, Stuart Levene, and is a current employee of Defendant. At the time that Plaintiff was promoted to manage the 1985 & Prior unit, Mr. Sherman was a Senior Claims Examiner.

        b.      Cynthia Lombardi: Ms. Lombardi is a current employee of Defendant and Stuart Levene's ex-wife. Despite this, Ms. Lombardi and Ms. Levene remain close, as evidenced by the fact that Ms. Levene hired Ms. Lombardi to assist her with ongoing projects for Defendant.

        c.      Stuart Levene: Mr. Levene is Ms. Levene's husband and, while not an employee of Defendant, Defendant regularly employs Mr. Levene's law firms to perform work for Defendant on litigation matters. In her position as manager of the 1985 & Prior unit, Plaintiff was ultimately responsible for supervising work performed by Mr. Levene's firm and approving bills and invoices – however, as discussed below, Ms. Levene effectively delegated that oversight to Mr. Sherman.

12.     As Defendant's Chief of Claims, Ms. Levene was in a position to determine which reinsurance matters Defendant would litigate, but because her husband's law firm would handle the litigation, Ms. Levene would personally benefit from any increase in these litigations or the fees that Defendant paid to her husband's law firm.

13.     Upon information and belief, Defendant paid Mr. Levene's law firm more than $13 million in legal fees in 2014.

14.     As of December 2014 when Plaintiff first reported her concerns to Defendant's Compliance Department, Plaintiff was not aware of any procedures put in place by Defendant to address the conflict of interest presented by Ms. Levene assigning litigations to and ultimately being responsible for approving invoices for her husband's law firm.

15.     Further, Plaintiff believed that the absence of any checks or balances created the potential for fraud against Defendant and its parent company.

16.     This conflict of interest was exacerbated by the fact that Ms. Levene had effectively delegated responsibility for supervision of the work performed by Mr. Levene and his law firm to Mr. Sherman – who was Mr. Levene's cousin. As a result, Mr. Sherman was in a position to sign off on legal fees paid to his cousin's law firm, with approval by Ms. Levene.

17.     Upon information and belief, it was not until June 2015 – which was after Plaintiff had first complained about this conflict of interest in December 2014 – that Defendant addressed this conflict and required that Defendant's legal department approve all invoices to Ms. Levene's husband's law firm.

18.     With respect to Mr. Sherman, Ms. Levene frequently provided Mr. Sherman with preferential treatment that was not afforded to other claims examiners. For example:

a.      Ms. Levene frequently bypassed Plaintiff and communicated directly with Mr. Sherman – who was supposed to report to Plaintiff – regarding matters pertaining to the 1985 & Prior unit. Mr. Sherman in turn frequently excluded Plaintiff from his communications with Ms. Levene. This lack of communication with Ms. Levene made it both more difficult for Plaintiff to perform her job and had the effect of undermining Plaintiff's authority and credibility with Plaintiff's other direct reports and supervisors. These individuals saw Ms. Levene's favorable treatment of Mr. Sherman and also began to bypass Plaintiff and go directly to Mr. Sherman for issues related to the 1985 & Prior unit.

b.      Ms. Levene provided Mr. Sherman with access and training that she did not provide to Plaintiff and other members of the 1985 & Prior unit. For example, on more than one occasion, Ms. Levene spent an inordinate amount of time explaining an underwriting file to Mr. Sherman, which is something that she would not have done for Plaintiff or other employees.

c.      Ms. Levene provided Mr. Sherman with more exposure to other members of senior management than she did for Plaintiff or other employees in Defendant's 1985 & Prior unit. Ms. Levene also sat with Mr. Sherman and dictated emails to him to send to executives of Defendant and Allegheny, Defendant's parent company.

d.      Ms. Levene hired two friends of Mr. Sherman based on Mr. Sherman's recommendation and we believe that Mr. Sherman received a referral bonus when Defendant hired these individuals.

e.      In stark contrast to Ms. Levene's treatment of Mr. Sherman, Ms. Levene constantly undermined Plaintiff's efforts to manage Mr. Sherman, who was ostensibly her subordinate. For example, when conducting calendar year 2013 performance appraisals for Mr. Sherman, Plaintiff's supervisor (Robert Rosen) required Plaintiff to change Mr. Sherman's rating

from a 4 to a 5, the highest possible rating, presumably at the request of Ms. Levene because Mr. Rosen rarely worked with Mr. Sherman and had no basis to support changing Mr. Sherman's rating.

19.     In March or April 2014, Plaintiff discussed her concerns about the conflict of interest with her supervision of Mr. Sherman with her supervisor (Robert Rosen), but Mr. Rosen declined to get involved, telling Plaintiff that she was "between a rock and a hard place."

20.     With respect to Ms. Lombardi, Ms. Levene provided preferential treatment in the following manner:

    a.     Ms. Levene hired Ms. Lombardi in late 2013 to assist her with administrative tasks on a number of larger matters. At the time that Defendant hired Ms. Lombardi, it was not widely known that she had previously been married to Mr. Levene and Plaintiff believes that Ms. Levene bypassed Defendant's standard job posting requirements when she hired Ms. Lombardi for a position that was not publicly posted.

    b.     In or around March 2014, Ms. Levene assigned Ms. Lombardi to report to Ms. Diaz so that Ms. Diaz could train her to be a Claims Examiner; however, Ms. Lombardi did not have the experience and qualifications that Defendant typically requires for Claims Examiners, yet she is presumably paid a Claims Examiner salary.

21.     Plaintiff attempted to make the best of a bad situation, but Ms. Levene's preferential treatment of her family members undermined Plaintiff's ability to perform her job.

22.     While these relationships created a clear conflict of interest for Ms. Levene because they required her to oversee work performed by her husband and his law firm, as well supervision of his family members, Plaintiff does not believe that these conflicts were adequately reported to Defendant's internal audit or compliance departments. As a result, prior to Plaintiff

6

raising her concerns about these conflicts, Plaintiff is not aware of any internal procedures put in place to manage these conflicts of interest.

**Plaintiff's Demotion to Fast Track Unit**

23.     In November 2014, Plaintiff met with Ms. Levene to have a discussion about Plaintiff's management of the 1985 & Prior unit.

24.     In this meeting, Ms. Levene criticized Plaintiff's management of the 1985 & Prior unit and told Plaintiff that all of her direct reports had complained about Plaintiff's management of the unit and that Plaintiff had lost their "faith."

25.     For her part, Plaintiff discussed how Ms. Levene's preferential treatment of Mr. Sherman made her job more difficult and how her supervisor (Robert Rosen) had failed to give her direction and guidance in her first management position. For her part, Ms. Levene agreed that Mr. Rosen had not effectively supported Plaintiff.

26.     At the conclusion of this meeting, Ms. Levene offered Plaintiff the option of continuing on as manager of the 1985 & Prior unit, provided that Plaintiff come up with a "blueprint" of how Plaintiff was going to "turn things around," or Ms. Levene offered to transfer Plaintiff to another management position within the Claims Department.

27.     Ms. Levene told Plaintiff that, while she could not provide Plaintiff with any details about this other "management opportunity," it was larger in size than the 1985 & Prior unit and would provide Plaintiff with a "fresh start."

28.     Ms. Levene then asked Plaintiff to get back to her within a week regarding whether Plaintiff wanted to pursue the other management opportunity.

29.     One week later, because Plaintiff felt that her management of the 1985 & Prior unit had already been undermined by Ms. Levene's preferential treatment of Mr. Sherman, Plaintiff told Ms. Levene that she would prefer the "fresh start" that Ms. Levene had offered.

30.     At this point, Ms. Levene – for the first time – told Plaintiff that this "fresh start" was actually management of Defendant's Fast Track unit.

31.     Defendant's Fast Track unit was a pre-existing unit that processed uncontested and straightforward claims, unlike the complex and substantive claims that Ms. Diaz had worked on for her prior eight years at TransRe and had managed in the 1985 & Prior unit. As a result, this new "management opportunity" was clearly a demotion.

32.     With Plaintiff out of the way, Ms. Levene used this opportunity to continue her preferential treatment of Mr. Sherman and promoted him to Plaintiff's former position as manager of the 1985 & Prior unit. Ms. Levene also promoted Mr. Sherman to make him an Assistant Vice President, making him an officer of the Company, a title that was never given to Plaintiff when she was manager of the 1985 & Prior unit.

**TransRe's Code of Conduct & Plaintiff's Complaint to TransRe's Compliance Department**

33.     As of December 2014, TransRe had a "Director, Executive Officer and Senior Financial Officer Code of Business Conduct and Ethics" ("TransRe Code of Conduct") in place that required high-level employees, such as Ms. Levene, to avoid any conflicts of interests, which the code defined as when "an individual's personal interest is adverse to, or may appear to be adverse to, the interests of [TransRe] as a whole."

34.     The TransRe Code of Conduct also provided that "[a]ny director, executive officer, or senior financial officer who is aware of a transaction or relationship that involves, or could reasonably be expected to involve a conflict of interest should promptly disclose the

situation to the Chairman of the Board or the Chairman of the Audit Committee to determine whether the transaction or relationship is in violation of this Code or the law and appropriate steps to be taken."

35.     Despite the above-outlined conflicts of interest, Plaintiff did not believe that Ms. Levene had disclosed the full extent of the above-outlined of interests conflicts to Defendant's Compliance Department so that appropriate steps could be taken to address these conflicts of interest – these facts were later confirmed by Defendant's Human Resources and Compliance Directors who both told Plaintiff that they were not aware of Ms. Levene and Ms. Lombardi's relationship at the time that Defendant hired Ms. Lombardi and that they were not aware that Mr. Sherman was the cousin of Ms. Levene's husband until Plaintiff's December 2014 complaint.

36.     The TransRe Code of Conduct prohibited retaliation against individuals that reported violations of the code. Specifically, the Code required senior level managers to take steps to ensure that TransRe "inform[ed] employees that [TransRe] will not allow retaliation for reports made in good faith" and stated that "[TransRe] will not tolerate retaliation for violations of this Code made in good faith."

37.     The TransRe Code of Conduct encouraged employees to report potential violations of the code.

38.     In December 2014, Plaintiff met with Sandra Rushbrook, Defendant's Compliance Director, to address concerns that Plaintiff had with the above-outlined conflicts of interest regarding Ms. Levene's employment of her husband's family members and oversight of work performed by Mr. Levene's law firm for litigation matters.

39.     In her complaint, Plaintiff also raised concerns regarding whether her race/national origin was a factor in the decision to move her to the Fast Track unit. Specifically,

Plaintiff, who is Latino and was born in Puerto Rico, was moved to the Fast Track unit along with the only two other Latino Claims Examiners in the Claims Department. In light of this and other evidence which Plaintiff believed showed that Ms. Levene harbored a bias against Latinos, Plaintiff expressed concern to Ms. Byron that their race/national origin may have played a factor in Ms. Levene moving them to the Fast Track unit.

40.     On January 5, 2015, Plaintiff met with Ms. Rushbrook and Ms. Byron, Defendant's Human Resources Director, to discuss her concerns again. At this meeting, Plaintiff specifically requested that Ms. Byron and Ms. Rushbrook interview Plaintiff's colleagues in Claims to confirm the concerns that Plaintiff raised, however, they failed to do so.

41.     Ms. Byron and Ms. Rushbrook conducted an investigation, which consisted of simply talking to Ms. Levene, and concluded that Ms. Levene's employment of her husband's family members was not a conflict of interest because these relationships did not meet the definition of "immediate family members" under the TransRe Code of Conduct.

42.     Because Ms. Byron reported to Ms. Levene, Ms. Levene was aware of Plaintiff's complaint. Indeed, after Plaintiff met with Ms. Bryon and Sandra Rushbrook on January 13, 2015 to discuss the results of their investigation, Plaintiff met with Ms. Byron, Ms. Rushbrook, and Ms. Levene to discuss Plaintiff's complaint.

43.     Plaintiff is not aware of any action taken by Defendant to address the concerns that Plaintiff raised regarding Ms. Levene's conflicts of interest.

44.     Following Plaintiff's complaints to Compliance/Human Resources, Ms. Levene retaliated against Plaintiff in the following ways:

a.     For the first time in Plaintiff's nine and a half-year career with Defendant, Plaintiff did not receive either a raise or a bonus.

      b.     Ms. Levene repeatedly set Plaintiff up to fail by assigning her tasks with short deadlines that were difficult to complete and then using this failure as justification for subsequent disciplinary actions.

      c.     Ms. Levene regularly lashed out against Plaintiff with angry outbursts towards Plaintiff, including outbursts in front of Plaintiff's co-workers and peers.

      d.     Ms. Levene unduly scrutinized Plaintiff's work performance and went so far as to have Defendant's IT Department provided her with a log of Plaintiff's activities, meetings, and emails. Plaintiff is not aware of Ms. Levene taking this action with respect to any other employees.

**Alleghany's Code of Conduct**

45.     Alleghany's Code of Business Conduct and Ethics ("Alleghany Code of Conduct"), which applies to all of Alleghany's subsidiaries, including Defendant, also required all of Defendant's employees to ensure that personal activities and interests did not conflict with their responsibilities to Alleghany and to avoid "even the appearance of a conflict of interest."

46.     With respect to conflicts of interest, the Alleghany Code of Conduct provides: "[A] conflict of interest may arise when you (or, as applicable, someone with a close relationship with you): . . . Let your business decisions be influenced, or appear to be influenced, by personal or family interests or friendships. . . [or] Have any other arrangement or circumstance, including family or other personal relationships, which might dissuade you from acting in the best interests of Alleghany."

47.     The Alleghany Code of Conduct further provides that: "When these situations occur, you should promptly notify a Compliance Contact who can then provide guidance regarding how best to remove or appropriately resolve the conflict."

48.     The Alleghany Code of Conduct requires managerial employees to maintain strict compliance with the code: "While all employees are expected to act ethically, each supervisor at Alleghany has the increased responsibility of leading by example. If you are in a management position, you have a special responsibility to conduct yourself in a manner that is consistent with the ethical and other standards set forth in the Code."

49.     The Alleghany Code of Conduct also encouraged employees to report potential violations of the code. Specifically, the code provided: "Any time you suspect or observe a violation of the Code, the law or any company policy, or you feel pressured to violate the Code, the law or any company policy, you are required to voice your concerns or report the suspected or actual violation."

50.     The Alleghany Code of Conduct prohibited retaliation against employees that make reports pursuant to the Alleghany Code of Conduct: "Do not be afraid to speak up and promote an ethical culture at Alleghany. We prohibit retaliation against any employee who, in good faith, voices concerns, reports violations or participates in an investigation."

51.     In March 2015, Plaintiff made an official complaint with Alleghany via Alleghany's Compliance Hotline. Upon information and belief, Ms. Levene was made aware of Plaintiff's complaint to Alleghany's Compliance Hotline.

52.     On April 22, 2015, Plaintiff met with Stela Burghart, Alleghany's Chief Compliance Officer, and reported the above-outlined concerns regarding Ms. Levene's conflicts of interests to Alleghany.

53.     In making this complaint, Plaintiff specifically addressed concerns regarding: (i) Ms. Levene's hiring of family members to work in Defendant's Claims Department, (ii) favoritism exhibited by Ms. Levene to Mr. Sherman which undermined Plaintiff's ability to do

her job, (iii) Ms. Levene's and Mr. Sherman's supervision of work performed by her husband's law firm for Defendant and their approval of invoices paid by Defendant to Mr. Levene's law firm, (iv) Ms. Levene's hiring of a former co-worker of Mr. Levene from his law firm for an unpublished position with Defendant.

54.     Plaintiff told Ms. Burghart that she was concerned about reporting these concerns because Ms. Levene had previously joked to others, "I'm HR. Who are you going to report me to?"

55.     In making this report, Plaintiff specifically expressed concern about: (a) the effect that these conflicts of interest had on Defendant's reputation in the reinsurance industry, (b) the fact that there did not appear to be any checks on Ms. Levene's authority, and (c) the effect that this could have on Alleghany's shareholders. Specifically, Plaintiff disclosed that colleagues in the industry had questioned her about all the business that Defendant gave to Mr. Levene's law firm and that Plaintiff felt that Ms. Levene had an incentive to bring additional claims by Defendant because the work would go to Mr. Levene's law firm.

56.     Plaintiff also disclosed that in 2014, Defendant had paid more than $13 million in fees to Ms. Levene's husband's law firm.

57.     Plaintiff also reported her concern that her race/national origin was a factor in the decision to transfer her from the 1985 & Prior unit to the Fast Track unit.

58.     Plaintiff also reported that since reporting her concerns to Defendant's Compliance Department, Ms. Levene had been retaliating against her by, among other things, denying Plaintiff a bonus/salary increase, questioning Plaintiff's expense reports, physically isolating Plaintiff from her co-workers, accusing Plaintiff of badmouthing the Fast Track unit to

her subordinates in the Fast Track Unit, and nitpicking her work in an effort to generate pre-textual reasons to discipline Plaintiff.

59.     Plaintiff believes that Ms. Levene was aware of her complaint to Alleghany's Compliance Department because, as part of her investigation, Ms. Burghart had a number of meetings with Ms. Byron and Gary Schwartz, Defendant's General Counsel, in Defendant's offices.

60.     Following Plaintiff's report to Alleghany, Ms. Levene retaliated against Plaintiff, both for her prior report to Defendant's Compliance Department and her more recent report to Alleghany in the following way:

        a.      Ms. Levene repeatedly set Plaintiff up to fail by assigning her tasks with short deadlines that were impossible to complete and then using this as justification for subsequent disciplinary actions.

        b.      Ms. Levene's angry outbursts towards Plaintiff increased in frequency and began to occur on an almost daily basis, including outbursts in front of Plaintiff's co-workers and peers.

        c.      On May 7, 2015, just two weeks after Plaintiff's meeting with Ms. Burghart, Ms. Levene issued Plaintiff a written performance warning that unfairly characterized Plaintiff's work performance and confirmed for Plaintiff that Ms. Levene was setting Plaintiff up to fail in an effort to terminate her employment because of her complaints to Defendant's and Alleghany's Compliance Department.

**Plaintiff's Medical Leave**

61.     As a result of Ms. Levene's constant scrutiny and increasing hostility, on May 8, 2015, Plaintiff's mental health provider recommended that she go out on a medical leave of

14

absence to recover from the stress, anxiety, and depression that resulted from Ms. Levene's retaliatory treatment of Plaintiff.

62.     Effective May 8, 2015, Plaintiff was out on a medical leave of absence. Plaintiff applied for short-term disability benefits, but the carrier denied Plaintiff benefits because it deemed Plaintiff's disability to be work-related. As a result, Plaintiff's was not paid during her leave after she exhausted her accrued paid time off.

63.     Plaintiff's medical leave was also designated as FMLA leave and Plaintiff provided medical documentation and information regarding her medical condition to the Hartford, Defendant's third-party administrator.

64.     Despite having provided information from Plaintiff's doctor concerning her medical leave to the Hartford, the Hartford continued to send Plaintiff correspondence requesting additional information concerning her medical leave. On various occasions, Plaintiff contacted the Hartford and they told Plaintiff that that they already had the required information in their files.

65.     Plaintiff was also in regular communication with Defendant about the status of her leave. For example, on August 14, 2015, Plaintiff texted Defendant's medical leave contact Tania Thomas to ask about the status of her FMLA leave and when her FMLA leave was scheduled to end. Ms. Thomas texted back and said "I do not know."

66.     On August 19, 2015, three business days' after Plaintiff's last contact with Defendant, TransRe notified Plaintiff that, because she had allegedly not provided certain information to the Hartford, Defendant was treating Plaintiff as having resigned her employment with Defendant effective on that date.

67.     Defendant made no attempt to address these concerns with Plaintiff directly before terminating her employment, despite knowing full well that Plaintiff was out on medical leave; instead, Defendant left Plaintiff in the dark about the status of her FMLA leave and then terminated her employment for failing to return from FMLA leave.

68.     On September 9, 2015, after Plaintiff's attorney addressed the retaliatory nature of Defendant's termination of Plaintiff's employment, Defendant reversed course and reinstated Plaintiff's employment with Defendant; however, on September 28, 2015, Defendant notified Plaintiff that when she returned to work she would no longer occupy her former position as manager of the Fast Track unit, but would instead be demoted to a Claims Examiner position and that Plaintiff would remain on written warning – and thus under the threat of termination.

69.     Defendant justified this demotion by claiming that Defendant had remedied all of the performance problems in the Fast Track unit that existed at the time that Plaintiff went out FMLA on leave and had eliminated her position. However, Defendant has not eliminated the position; instead, Mr. Rosen continues to serve as supervisor of the Fast Track Unit.

70.     On November 9, 2015, Plaintiff returned from her medical leave and was assigned to a Claims Examiner position, reporting to her former supervisor.

71.     Since her return from medical leave, Ms. Levene has subjected Plaintiff to increased scrutiny and negative performance reviews in retaliation for Plaintiff's prior complaints to Defendant's Human Resources and Compliance Departments and Alleghany's Compliance Department.

16

## FIRST CAUSE OF ACTION
### (Violation of Dodd-Frank Wall Street Reform and Consumer Protection Act)

72.     Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

73.     At all relevant times, Defendant was an "employer" within the meaning of the anti-retaliation provisions of Dodd-Frank, 15 U.S.C. § 78u-6(h).

74.     As set forth above, Defendant is a wholly-owned subsidiary of Alleghany, a publicly held corporation. As a result, Defendant is subject to the anti-retaliation provisions of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, and Dodd-Frank.

75.     Plaintiff was a whistleblower within the meaning of 15 U.S.C. § 78u-6(h) because she made disclosures to Defendant that were protected under 18 U.S.C. § 1514A. Specifically, Plaintiff reported potential violations of both TransRe's and Alleghany's Code of Conduct provisions regarding conflicts of interest to these entities' respective compliance personnel that could result in fraud against Alleghany and its shareholders.

76.     As set forth above, Defendant violated Dodd-Frank's anti-retaliation provisions by taking adverse employment actions against Plaintiff, including, but not limited to, (i) unnecessarily scrutinizing Plaintiff's work performance in order to find reasons to criticize her work performance, (ii) issuing Plaintiff a written performance warning that threatened Plaintiff with termination; (iii) terminating Plaintiff's employment while claiming that Plaintiff was on an unapproved leave of absence, (iv) eliminating Plaintiff's position as manager of the Fast Track unit while Plaintiff was out on medical leave, (v) demoting Plaintiff to a Claims Examiner position, and (vi) since her return from medical leave, Ms. Levene has subjected Plaintiff to increased scrutiny and negative performance reviews, all because Plaintiff made disclosures to Defendant that were protected under 18 U.S.C. § 1514A.

77.     The above-outlined retaliation also had the effect of creating a hostile work environment for Plaintiff in retaliation for Plaintiff's protected disclosures pursuant to 18 U.S.C. § 1514A.

78.     As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered and will continue to suffer severe financial hardship, as well as mental and emotional distress and injury, including the lost of compensation, loss of future compensation and earning power, and other additional damages, including interest, attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**(FMLA Retaliation)**

79.     Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

80.     At all relevant times, Plaintiff was an "eligible employee" within the meaning of the FMLA. Similarly, at all relevant times, Defendant was a "covered employer" within the meaning of the FMLA.

81.     Plaintiff engaged in protected activity when she requested – and took – an FMLA-designated leave of absence from May 8, 2015 through July 30, 2015.

82.     As set forth above, Defendant violated the FMLA by taking adverse employment actions against Plaintiff, including, but not limited to, (i) terminating Plaintiff's employment while claiming that Plaintiff was on an unapproved leave of absence, (ii) eliminating Plaintiff's position as manager of the Fast Track unit while Plaintiff was out on medical leave, and (iii) demoting Plaintiff to a Claims Examiner position, because Plaintiff exercised rights protected by the FMLA, and (iv) since her return from FMLA leave, Ms. Levene has subjected Plaintiff to increased scrutiny and negative performance reviews, all in retaliation for exercising rights protected by the FMLA.

83.     The above-outlined retaliation also had the effect of creating a hostile work environment for Plaintiff in retaliation for Plaintiff's exercise of rights protected by the FMLA.

84.     As a direct and proximate result of Defendant's unlawful conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

85.     Defendant's unlawful actions constitute bad faith, malicious, willful and wanton violations of the FMLA for which Plaintiff is entitled to an award of liquidated damages.

### THIRD CAUSE OF ACTION
**(Retaliation in Violation of the State Human Rights Law)**

86.     Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

87.     At all relevant times, Plaintiff was an "eligible employee" within the meaning of the State Human Rights Law. Similarly, TransRe was an "employer" within the meaning of the State Human Rights Law.

88.     Plaintiff engaged in the following activities which constitute protected activity under the State Human Rights Law: (i) in December 2014, Plaintiff raised concerns that her transfer from manager of the 1985 & Prior unit to the Fast Track unit was based on her race/national origin, and (ii) in May 2015, Plaintiff requested a medical leave of absence as an accommodation for the stress, anxiety, and depression that she was suffering from as a result of Ms. Levene's retaliatory treatment of her.

89.     As set forth above, Defendant violated the State Human Rights Law by taking adverse employment actions against Plaintiff, including, but not limited to, (i) unnecessarily scrutinizing Plaintiff's work performance in order to find reasons to criticize her work performance, (ii) issuing Plaintiff a written performance warning that threatened Plaintiff with

termination; (iii) terminating Plaintiff's employment while claiming that Plaintiff was on an unapproved leave of absence, (iv) eliminating Plaintiff's position as manager of the Fast Track unit while Plaintiff was out on medical leave, (v) demoting Plaintiff to a Claims Examiner position, and (vi) since her return from medical leave, Ms. Levene has subjected Plaintiff to increased scrutiny and negative performance reviews, all because Plaintiff exercised rights protected by the State Human Rights Law when she complained about potential race/national origin discrimination and/or requested an accommodation for her disability.

90.     The above-outlined retaliation also had the effect of creating a hostile work environment for Plaintiff in retaliation for Plaintiff's exercise of rights protected by the State Human Rights Law.

91.     As a direct and proximate result of Defendant's retaliatory conduct in violation of the State Human Rights Law, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which Plaintiff is entitled to an award of damages.

92.     As a direct and proximate result of Defendant's retaliatory conduct in violation of the State Human Rights Law, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of damages.

## FOURTH CAUSE OF ACTION
### (Disability Discrimination in Violation of the State Human Rights Law)

93.     Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

94.     At all relevant times, Plaintiff was an "eligible employee" within the meaning of the State Human Rights Law. Similarly, TransRe was an "employer" within the meaning of the State Human Rights Law.

95.     Defendant violated the State Human Rights Law when it (i) failed to accommodate Plaintiff and instead terminated her employment with Defendant in August 2015 while claiming that Plaintiff was on an unapproved leave of absence and (ii) eliminated Plaintiff's position as manager of the Fast Track unit while she was out on medical leave.

96.     As a direct and proximate result of Defendant's conduct in violation of the State Human Rights Law, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which Plaintiff is entitled to an award of damages.

97.     As a direct and proximate result of Defendant's conduct in violation of the State Human Rights Law, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of damages.

### FIFTH CAUSE OF ACTION
**(Retaliation in Violation of the City Human Rights Law)**

98.     Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

99.     At all relevant times, Plaintiff was an "eligible employee" within the meaning of the City Human Rights Law. Similarly, TransRe was an "employer" within the meaning of the City Human Rights Law.

100.    Plaintiff engaged in the following activities which constitute protected activity under the City Human Rights Law: (i) in December 2014, Plaintiff raised concerns that her transfer from manager of the 1985 & Prior unit to the Fast Track unit was based on her race/national origin, and (ii) in May 2015, Plaintiff requested a medical leave of absence as an accommodation for the stress, anxiety, and depression that she was suffering from as a result of Ms. Levene's retaliatory treatment of her.

101.    As set forth above, Defendant violated the City Human Rights Law by taking adverse employment actions against Plaintiff, including, but not limited to, (i) unnecessarily scrutinizing Plaintiff's work performance in order to find reasons to criticize her work performance, (ii) issuing Plaintiff a written performance warning that threatened Plaintiff with termination; (iii) terminating Plaintiff's employment while claiming that Plaintiff was on an unapproved leave of absence, (iv) eliminating Plaintiff's position as manager of the Fast Track unit while Plaintiff was out on medical leave, (v) demoting Plaintiff to a Claims Examiner position, and (vi) since her return from medical leave, Ms. Levene has subjected Plaintiff to increased scrutiny and negative performance reviews, all because Plaintiff exercised rights protected by the City Human Rights Law when she complained about potential race/national origin discrimination and/or requested an accommodation for her disability.

102.    The above-outlined retaliation also had the effect of creating a hostile work environment for Plaintiff and that was in retaliation for Plaintiff's exercise of rights protected by the City Human Rights Law.

103.    As a direct and proximate result of Defendant's retaliatory conduct in violation of the City Human Rights Law, Plaintiff has suffered, and continues to suffer, monetary and/or

economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which Plaintiff is entitled to an award of damages.

104.    As a direct and proximate result of Defendant's retaliatory conduct in violation of the City Human Rights Law, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of damages.

105.    Defendant's unlawful actions constitute bad faith, malicious, willful and wanton violations of the City Human Rights Law for which Plaintiff is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Disability Discrimination in Violation of the City Human Rights Law)**

106.    Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

107.    At all relevant times, Plaintiff was an "eligible employee" within the meaning of the City Human Rights Law. Similarly, TransRe was an "employer" within the meaning of the City Human Rights Law.

108.    Defendant violated the City Human Rights Law when it (i) failed to accommodate and instead terminated Plaintiff's employment with Defendant in August 2015 while claiming that Plaintiff was on an unapproved leave of absence and (ii) eliminated Plaintiff's position as manager of the Fast Track unit while Plaintiff was out on medical leave.

109.    As a direct and proximate result of Defendant's conduct in violation of the City Human Rights Law, Plaintiff has suffered, and continues to suffer, monetary and/or economic

damages, including, but not limited to, loss of past and future income, compensation and benefits, for which Plaintiff is entitled to an award of damages.

110.    As a direct and proximate result of Defendant's conduct in violation of the City Human Rights Law, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of damages.

## SEVENTH CAUSE OF ACTION
### (Breach of Contract)

111.    Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

112.    Plaintiff and Defendant are parties to enforceable contractual relationship that includes Defendant's obligation to avoid retaliating against Plaintiff for making good faith reports of violations of the TransRe Code of Conduct and the Alleghany Code of Conduct, implied by the fact of the anti-retaliation policies contained therein.

113.    As set forth above, Defendant violated Dodd-Frank's anti-retaliation provisions by taking adverse employment actions against Plaintiff, including, but not limited to, (i) unnecessarily scrutinizing Plaintiff's work performance in order to find reasons to criticize her work performance, (ii) issuing Plaintiff a written performance warning that threatened Plaintiff with termination; (iii) terminating Plaintiff's employment while claiming that Plaintiff was on an unapproved leave of absence, (iv) eliminating Plaintiff's position as manager of the Fast Track unit while Plaintiff was out on medical leave, (v) demoting Plaintiff to a Claims Examiner position, and (vi) since her return from medical leave, Ms. Levene has subjected Plaintiff to

increased scrutiny and negative performance reviews all because Plaintiff made good faith reports of violations of the TransRe Code of Conduct and the Alleghany Code of Conduct.

114.    As a direct and proximate result of Defendant's breach of contract, Plaintiff has suffered and continues to suffer substantial monetary and/or economic damages, including but not limited to, loss of past and future income.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.    An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C.    An order directing Defendant to place Plaintiff in the position she would have occupied but for Defendant's discriminatory, retaliatory and/or otherwise unlawful treatment of her, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect Plaintiff;

D.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all available monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

E.    An award of damages in an amount to be determined at trial, plus prejudgment

interest, to compensate Plaintiff for all available non-monetary and/or compensatory damages, including, but not limited to, compensation for her severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

F.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

G.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

H.      An award of punitive damages;

I.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

J.      Such other and further relief as the Court may deem just and proper.


## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: February 22, 2016

FILOSA LAW FIRM, PLLC

By:     _____
        Gregory N. Filosa (GF-3862)

        111 John Street, Suite 2510
        New York, NY  10038
        Tel:    (212) 256-1780
        Fax:    (212) 256-1781
        gfilosa@filosalaw.com

        COUNSEL FOR PLAINTIFF