MARC E. BERNSTEIN
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
TELEPHONE: (212) 318-6000
FACSIMILE: (212) 230-5127

*Attorneys for Defendant Transatlantic Reinsurance Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ILEANA DIAZ,<br><br>                        Plaintiff,<br><br>vs.<br><br>TRANSATLANTIC REINSURANCE COMPANY,<br><br>                        Defendant. | 1:16-cv-01355 (GBD) |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS**

## **TABLE OF CONTENTS**

Page(s)

I. INTRODUCTION ................................................................................................................ 1
II. BACKGROUND ................................................................................................................. 3
    A. The Code of Conduct ................................................................................................ 5
    B. The TransRe Senior Officer Code ........................................................................... 6
    C. The Dodd-Frank Allegation ..................................................................................... 7
III. ARGUMENT ...................................................................................................................... 7
    A. Diaz's Dodd-Frank Claim Should Be Dismissed ..................................................... 7
    B. The Breach of Contract Claim Should Be Dismissed ............................................ 13
IV. CONCLUSION ................................................................................................................. 14

I.     INTRODUCTION

Plaintiff Ileana Diaz ("Diaz") was an Assistant Manager in the claims department of Defendant Transatlantic Reinsurance Company ("TransRe"), which is a reinsurance company that is a wholly-owned subsidiary of Alleghany Corporation.  In November 2014, Diaz's supervisor -- Beth Levene -- criticized Diaz's performance and gave Diaz the option of either improving her performance or transferring to be the manager of another claims division of TransRe.  Diaz decided to take the transfer, which Diaz viewed as a demotion.  Within a few weeks after that transfer, Diaz complained to TransRe, asserting that Ms. Levene was biased against Latinos, was biased in favor of staff members who were close to Ms. Levene's husband, and that TransRe was using a law firm where Ms. Levene's husband worked to handle certain TransRe litigation matters.

Diaz has now brought suit against TransRe and her core claim in the suit (First Cause of Action) is a purported violation of the Dodd-Frank Act.  The Dodd-Frank Act, however, deals exclusively with complaints made to the SEC or complaints of violations of certain enumerated federal statutes such as mail fraud, wire fraud and securities fraud.  Diaz's complaint to TransRe about Ms. Levene's supposed bias in favor of certain employees and TransRe's use of a particular law firm for litigation matters has nothing whatsoever to do with federal crimes/securities fraud.  This is a run of the mill employment dispute where an employee is claiming that the company purportedly did not follow its own internal conflict of interest policy.  Indeed, Diaz does not even claim that any of the company's financial statements were inaccurate.

The courts -- including the Second Circuit -- have been vigilant in repeatedly dismissing claims of employees who, like Diaz, attempt to convert routine employment disputes regarding internal disagreements and company policies into a purported Dodd-Frank/SOX claim.  A bald

assertion that TransRe's supposed failure to follow its internal policies "could result in fraud against . . . shareholders" (Complaint ¶75 ) clearly is insufficient as a matter of law to manufacture a Dodd-Frank/SOX claim.  E.g., Nielsen v. AECOM Tech. Corp., 762 F3d 214, 223 (2d Cir. 2014) (although the plaintiff  alleged that the company's failure to follow certain safety policies had "the potential of exposing the company to extreme financial risk" and therefore "constituted potential shareholder fraud, this bald statement is insufficient as a matter of law" to sustain a SOX claim) (citations omitted); Day v. Staples, Inc., 555 F.3d 42, 56 (1st Cir. 2009) (complaints about purported unlawful and unethical activity, including the company's alleged failure to follow company policies regarding customer credits, overstating company revenues and inaccurate accounting, is not "fraud against shareholders" because a disagreement with management about internal company practices and financial matters that are not reported to shareholders is not protected activity under SOX).

      Likewise, Diaz's parallel claim that TransRe's purported failure to follow its Code of Conduct constituted a "breach of contract" (Seventh Cause of Action) should be dismissed.  The Code of Conduct that Diaz asserts TransRe did not follow specifically states that it is merely a "guide" for informing employee conduct, that it is "<u>not</u> a contract of employment" and, further, that "[n]othing in the Code or other Alleghany policies should be construed as a promise of any kind, or creating a contract regarding wages or any other working conditions."  (Ex. B to Declaration of Marc E. Bernstein, dated April 19, 2016, at 23)(emphasis added); Lobosco v. N.Y. Tel. Co., 96 N.Y.2d 312, 315, 317 (2001) (dismissing employee's claim for breach of contract premised upon Code of Conduct's non-retaliation provision because Code of Conduct stated that it "is not a contract of employment and does not create any contractual rights of any kind" and holding that "[r]outinely issued employee manuals, handbooks and policy statements

should not lightly be converted into binding employment agreements [because to do so] would subject employers who have developed written policies to liability for breach of employment contracts upon the mere allegation of reliance on a particular provision.").

Accordingly, TransRe respectfully requests that the Court grant its motion to dismiss the First and Seventh causes of action in the Complaint.

## II. BACKGROUND

The following facts are pled in the Complaint or are contained in the codes of conduct that are quoted throughout the Complaint and which form the basis of Diaz's purported claim for breach of contract.[1]

TransRe is a reinsurance company that is not a public company. TransRe is a wholly-owned subsidiary of Alleghany Corporation ("Alleghany"), which is a public company. (Ex. A, Complaint ¶6.)

TransRe hired Diaz as a Senior Reinsurance Claims Examiner in July 2006 and TransRe promoted Diaz to Assistant Manager in September 2013 to manage one of TransRe's claims

---

[1] The Complaint is attached as Exhibit A to the Bernstein Declaration. The Alleghany Code of Business Conduct and Ethics (the "Code of Conduct") and the Transatlantic Holdings, Inc. Director, Executive Officer and Senior Financial Officer Code of Business Conduct and Ethics (the "TransRe Senior Officer Code") are attached as Exhibits B and C to the Bernstein Declaration. The Code of Conduct and the TransRe Senior Officer Code are quoted and cited throughout the Complaint (¶¶ 33-37, 45-50, 75, 112) and form the basis of Diaz's breach of contract claim. Bank of N.Y. Mellon Trust Co. v. Morgan Stanley, 2011 WL 2610661 (S.D.N.Y. 2011) (in deciding a motion to dismiss, documents that are quoted in the complaint or that the plaintiff either possessed or knew about and relied upon in bringing the suit can be considered) (collecting cases); In re JPMorgan Chase & Co., 2014 WL 1297446, *4 (S.D.N.Y. 2014) (Daniels, J.) (in deciding a motion to dismiss, "the Court may consider also the full text of 'documents incorporated into the complaint by reference'") (quoting Tel Labs, Inc. v Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)).

units that was called the "1985 and Prior" unit. (Id. ¶8.) Diaz reported to a manager who, in turn, reported to Beth Levene, who is TransRe's Chief Claims Officer. (Id. ¶10.)

Diaz supervised two people who were not relatives of Ms. Levene but had connections to Ms. Levene: a cousin of Ms. Levene's husband (Wesley Sherman) and the ex-wife of Ms. Levene's husband (Cynthia Lombardi). (Id. ¶11b, c.) In addition, TransRe retained the law firm where Ms. Levene's husband worked to handle certain litigation matters and the law firm received more than $13 million in fees for its work in 2014. (Id. ¶11c, 13.)

In November 2014, Ms. Levene met with Diaz to discuss Diaz's management of the 1985 & Prior unit, and Ms. Levene criticized Diaz's performance. (Id. ¶23-24.) Ms. Levene told Diaz that she could remain as the manager of the 1985 & Prior unit if she could turn things around or she could choose to make a fresh start by transferring to another management position within the TransRe claims department. (Id. ¶26.) Diaz told Ms. Levene that she would prefer the transfer, which was managing the "Fast Track" unit. (Id. ¶29-30.) Diaz viewed this transfer as a demotion. (Id. ¶31.)

In December 2014, after the transfer that Diaz viewed as a demotion, Diaz met with TransRe's Chief Compliance Officer (in December 2014) to address purported concerns that she had regarding what she considered to be a conflict of interest in TransRe's employment of Mr. Sherman and Ms. Lombardi and TransRe's use of the law firm where Ms. Levene's husband worked. (Id. ¶38.) Diaz also asserted that her race/national origin (Latino and Puerto Rican) had been factors in her transfer. (Id. ¶39.) Likewise, in March 2015 Diaz made a complaint to Alleghany's compliance hotline and in April 2015 she met with Alleghany's Chief Compliance Officer. (Id. ¶51-52.) Diaz alleges that she expressed concern that the alleged "conflicts" could

affect TransRe's reputation and that she was concerned about Alleghany's shareholders. (Id. ¶55.)

After Diaz received a written performance warning on May 7, 2015, she immediately went on a medical leave of absence because of her stress and anxiety, which lasted for more than six months. (Id. ¶60c, 61, 70.) By the time that Diaz returned to TransRe (on November 9, 2015) the separate position of Fast Track manager had been eliminated and Diaz thereafter became a Claims Examiner. (Id. ¶70, 76(iv).)

Diaz concedes that <u>before</u> Diaz had ever complained to the compliance department about supposed conflicts, Ms. Levene already had substantially criticized Diaz's performance, had "demoted" Diaz to the Fast Track unit, and had told Diaz that Diaz's own subordinates had lost faith in Diaz. (Id. ¶23-31.) Nevertheless, Diaz asserts that her subsequent complaints to the compliance department at TransRe and Alleghany resulted in increased scrutiny of her work, the performance warning, the alleged termination of her employment while on leave, the elimination of the position of Fast Track manager, and an alleged demotion to Claims Examiner. (Id. ¶76.)

    A.    The Code of Conduct

The Code of Conduct provides that it is a "guide to your decisions" and employees "should use the Code, in conjunction with your company policies, handbooks and manuals, to guide and inform your conduct." (Ex. B at 1.) It further provides that it is not a contract of employment and that nothing in the Code of Conduct -- or any other Alleghany policies -- should be construed as a promise of any kind:

> The Code and other company policies are <u>not a contract of employment</u>. <u>Nothing in the Code or other Alleghany policies should be construed as a promise of any kind</u>, or as creating a contract regarding wages or any other working conditions. Alleghany employees have the right to terminate their employment relationship at any time for any reason or no reason; likewise, Alleghany has that same right to terminate the employment of any employee.

(Id. at 23) (emphasis added). "Alleghany" policies refers collectively to the policies of "all of Alleghany Corporation and its subsidiaries worldwide," which includes TransRe's policies. (Id. at 3.)

The Code of Conduct does not prohibit the employment of relatives. Rather, the company "reserve[s] the right to prohibit the hire of a relative of any employee if a relative occupies a position in which he or she can influence the terms and conditions of the employment of another relative or directly or indirectly supervises another relative." (Id. at 9-10.) Moreover, a "relative" is defined as: "A person's spouse; civil partner; parent; grandparent; child; grandchild; sibling; spouse of child; parent or sibling of a spouse; any person who resides in the same household or with whom the person has an intimate relationship." (Id. at 26.) Thus, neither Mr. Sherman nor Ms. Lombardi were "relatives" of Ms. Levene under the Code of Conduct. Moreover, the Code of Conduct clearly addresses the employment of relatives -- Ms. Levene's husband has never been employed with TransRe. TransRe retained the law firm where Ms. Levene's husband worked to handle certain litigations and Diaz does not allege that any of that legal work was poorly done or that the law firm's fees were inaccurate or improper.[2]

B.   The TransRe Senior Officer Code

Like the company-wide Code of Conduct, the TransRe Senior Officer Code serves "as a source of guiding principles for directors, executive officers, and senior financial officers." (Ex. C at 1) (emphasis added). Moreover, the Code of Conduct provides that all of the policies of Alleghany and its subsidiaries (which includes the TransRe Senior Officer Code) are not a contract of employment and should not be construed as a promise of any kind. (Ex. B at 23.)

---

[2] That is because Diaz is aware that the law firm's fees are lower than the fees of most of the other New York City law firms that TransRe uses.

Furthermore, the TransRe Senior Officer Code does not even apply to Diaz. Rather, it applies to TransRe's Board of Directors, executive officers and senior financial officers, which is defined as "the chief executive officer, chief financial officer, and controller of TRH and the chief financial officer and controller of each significant TRH subsidiary." (Ex. C at 1, 5.) Diaz does not allege that she was a director, executive officer or senior financial officer of TransRe.

Moreover, the TransRe Senior Officer Code defines a "conflict of interest" as occurring when an individual's personal interest is <u>adverse</u> to TransRe. (<u>Id.</u> at 2.) Diaz does not allege that anyone's interests -- not Diaz, not Ms. Levene, not Mr. Sherman, not Ms. Lombardi, not Mr. Levene's law firm -- were <u>adverse</u> to TransRe or, indeed, that anyone engaged in any actual improper conduct that was adverse to TransRe.

    C.    <u>The Dodd-Frank Allegation</u>

The sole source of the supposed "protected activity" for Diaz's Dodd-Frank claim is her alleged complaints regarding her views of the company's internal conflict of interest policies. (Ex. A. ¶75.) Then, in an apparent nod to the statute's requirement of a federal crime/securities fraud, Diaz simply alleges that TransRe's employment of two junior claims employees and its retention of a particular outside law firm -- with no alleged improper conduct by any of those people -- "could" result in "fraud against Alleghany and its shareholders." (<u>Id.</u>)

**III.    ARGUMENT**

    A.    <u>Diaz's Dodd-Frank Claim Should Be Dismissed</u>

The Dodd-Frank Wall Street Reform and Consumer Protection Act prohibits retaliation against "whistleblowers" who: (i) provide information to the SEC; (ii) initiate, testify or assist in

an investigation or action by the SEC; or (iii) make disclosures that are protected under the Sarbanes-Oxley Act ("SOX"). 15 U.S.C. § 78u-6(h).[3]

Diaz did not provide any information to the SEC or participate in any SEC investigation but she asserts that she made disclosures that are protected by SOX. However, SOX only applies to complaints regarding certain enumerated federal crimes/securities fraud: "section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders." 18 U.S.C. § 1514(A)(a)(1). A person's <u>subjective</u> belief that a federal crime/securities fraud has occurred is not enough -- that belief must be <u>objectively</u> <u>reasonable</u>. The courts have been extremely vigilant in not permitting employees to manufacture a SOX claim simply by alleging -- as Diaz does here -- that a purported violation of a company policy or other improper/illegal conduct amounts to securities fraud.

The decision of the Second Circuit in <u>Nielsen v. AECOM Tech. Corp.</u>, 762 F.3d 214 (2d Cir. 2014), is directly on point. There, the employee believed that the company was violating applicable fire safety standards and had covered up the false approval of fire safety designs, and he was fired after he complained about such "fraudulent business practices." <u>Id.</u> at 217-18. His

---

[3] The Dodd-Frank Act defines a "whistleblower" as: "any individual who provides, or 2 or more individuals acting jointly who provide, information relating to a violation of the securities laws <u>to the Commission</u>, in a manner established, by rule or regulation, by the Commission." 15 U.S.C. § 78u-6(a)(6)(emphasis added). Although Diaz clearly is not a "whistleblower" under this definition because she did not provide any information to the SEC, the circuit courts currently are split as to whether Dodd-Frank's non-retaliation provision applies beyond the statutory definition of "whistleblowers." <u>Compare</u> <u>Asadi v. G.E. Energy (USA), L.L.C.</u>, 720 F.3d 620 (5th Cir. 2013) (the non-retaliation provision in Dodd-Frank applies only to "whistleblowers" as defined in the statute) <u>with</u> <u>Berman v. Neo@Ogilvy LLC</u>, 801 F.3d 145 (2d. Cir. 2015) (disagreeing with <u>Asadi</u>). TransRe acknowledges that <u>Berman</u> currently controls this issue in the Second Circuit but reserves the right to raise this additional argument in the event that the governing law changes.

complaint alleged that he reasonably believed that these internal practices constituted "fraud upon their shareholders." Id. at 222. The Second Circuit dismissed the claim because such a "conclusory statement" is insufficient as a matter of law to establish SOX protected activity and the fire safety violations (like Diaz's assertion of violation of the conflict policy) had nothing to do with any "federal statute or regulation." Id. "To have an objectively reasonable belief that there has been shareholder fraud, the complaining employee's theory of such fraud must at least approximate the basic elements of a claim for securities fraud." Day v. Staples, 555 F.3d 42, 55-56 (1st Cir. 2009)); Kantin v. Met. Life Ins. Co., 2016 WL 1020988, *3 (S.D.N.Y) (employee's complaint about unlawful and improper pricing does not constitute SOX-protected activity because it "does not relate to a matter that rises to the level of fraud" and "does not give rise to an objectively plausible concern regarding shareholder fraud").

As the Nielsen court held, "[w]hile the complaint states that the 'practice had the potential of exposing the company to extreme financial risk' and 'thus constituted potential shareholder fraud,' this bald statement is insufficient as a matter of law to make out a claim under §1514A." Nielsen, 762 F.3d at 223 (citations omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand a motion to dismiss; the court must examine the allegations to determine whether there is a plausible claim and conclusory allegations are "not entitled to be assumed to be true"); In re JP Morgan Chase & Co., 2014 WL 1297446, *4 (S.D.N.Y. 2014) (Daniels, J.) (on a motion to dismiss, the complaint cannot rely on "legal conclusions" and "labels").

Indeed, Diaz's conclusory allegation regarding supposed "fraud against shareholders" is even weaker than the allegation that the Second Circuit ruled was insufficient in Nielsen. Diaz

does not even allege that she had a belief -- like the alleged belief of the employee in <u>Nielsen</u> -- that there <u>was</u> fraud against shareholders but, rather, she merely alleges that there was "the potential" for fraud against shareholders. (Ex. A ¶15.) In order to be protected activity, an employee must have held a "belief about an <u>existing</u> violation." <u>Livingston v. Wyeth, Inc.</u>, 520 F.3d 344, 352 (4th Cir. 2008) (emphasis in original). In other words, "the employee must have an objectively reasonable belief that a violation is <u>actually occurring</u>" because SOX does not protect speculative and hypothetical "belief[s] that a violation is <u>about to happen upon some future contingency</u>." <u>Id.</u> (emphasis added) (complaints about potential misrepresentations to internal compliance auditors and to the FDA are not SOX-protected activity). Moreover, the connection between Diaz's claim and supposed "fraud against shareholders" is even more attenuated than in <u>Nielsen</u>, where the employee alleged improper conduct at the <u>publicly-traded entity</u>. Diaz, however, only takes issue with a purported conflict at TransRe and does not allege any issue at the publicly-traded company (Alleghany).

Likewise, in <u>Day v. Staples, Inc.</u>, 555 F.3d 42 (1st Cir. 2009), the employee claimed that the company violated its policies regarding customer credits, had overstated company revenues and had manipulated its accounting data that he believed violated the company's Code of Conduct and had "defrauded Staples' shareholders." <u>Id.</u> at 45. However, disagreements with management about company practices, losses of potential revenue, and other matters that are not reported to shareholders do not amount to securities fraud. <u>Id.</u> at 56. The court explained:

> To have an objectively reasonable belief there has been shareholder fraud, the complaining employee's theory of such fraud must at least approximate the basic elements of a claim of securities fraud . . . . The elements of a cause of action for securities fraud 'resembl[e] . . . common-law tort actions for deceit and misrepresentation.' Those elements typically include <u>a material misrepresentation or omission, scienter, loss, and a causal connection between the misrepresentation or omission and the loss</u> . . . . The employee need not reference a specific statute, or prove

> actual harm, but he must have an objectively reasonable belief that the company intentionally misrepresented or omitted certain facts to investors, which were material and which risked loss.
>
> <u>Day's assertions do not meet the basic components of fraud or of securities fraud. A disagreement with management about internal tracking systems which are not reported to shareholders is not actionable.</u> Several of Day's complaints amount to allegations that the company's practices did not maximize shareholder profits. <u>Day's belief is not itself an objectively reasonable belief that shareholders have been or are likely to be defrauded.</u>
> . . .
>
> Day's belief that the process of canceling and reissuing return orders constituted fraud on shareholders because it permitted courier overbilling lacks objective reasonableness. The aging days metric that Day describes as "data manipulation" <u>was unrelated to the financial condition of the company, and it was never reported to shareholders</u>. Day argues that the practice led to a "needless loss of revenue [that] detrimentally affected Staples' shareholders." <u>A claim of "needless loss of revenue" is not a claim of fraud. Even if Staples's pick-up order system allowed the possibility of overbilling by a delivery company, as Day alleged, that is a far cry from fraud.</u>

(<u>Id.</u> at 56) (citations omitted) (emphasis added).

Similarly, in <u>Kantin</u>, the employee complained about unlawful and improper pricing practices at the company. The court held that connecting such a complaint to "fraud against shareholders" is simply "too tenuous." <u>Kantin</u>, 2016 WL 1020988 at * 3. <u>See also</u> <u>Andaya v. Atlas Air, Inc.</u>, 2012 WL 1871511 (S.D.N.Y. 2012) (complaints about employment and staffing issues, excessive use of comp time, improper receipt of fees from vendors, and millions of dollars in alleged corporate waste does not constitute SOX-protected activity).

Diaz's supposed "concern" regarding TransRe's choice of whom to hire and what law firm TransRe should use are even weaker than the complaints that the courts rejected in <u>Day</u>, <u>Kantin</u> and <u>Andaya</u> -- which had involved employee complaints about inaccurate financial information, manipulation of financial data, excessive fees, and improper pricing. Here, Diaz does not even allege that any of TransRe's financial information was incorrect. <u>See</u> <u>Day</u>, 555

F.3d at 56 (complaints about purported unlawful and unethical activity, including the company's alleged failure to follow company policies regarding customer credits, overstating company revenues and inaccurate accounting, is not "fraud against shareholders" because a disagreement with management about internal company practices and financial matters that are not reported to shareholders is not protected activity under SOX); Kantin, 2016 WL 1020988 at *3 (employee's complaint about unlawful and improper pricing does not constitute SOX-protected activity because it "does not give rise to an objectively plausible concern regarding shareholder fraud"); Andaya, 2012 WL 1871511 at *4-5 (employee's complaints about excessive consulting fees and the inappropriate receipt of fees for speaking engagements do not reasonably rise to the level of securities fraud); Welch v. Chao, 536 F.3d 269, 279 n.5 (4th Cir. 2008) (employee's complaints regarding alleged improper accounting practices do not constitute SOX-protected activity because such conduct is not a violation of any of the enumerated laws in § 1514A); Villaneuva v. U.S. Dep't of Labor, 743 F.3d 103, 109-10 (5th Cir. 2014) (allegations of violations of foreign tax laws cannot support a reasonable belief that a federal crime was committed).

In addition, scienter clearly is a requirement of fraud and Diaz does not allege that anyone at TransRe, including Ms. Levene, had <u>intended to deceive shareholders</u>. To the contrary, Diaz alleges that Ms. Levene's intent was to <u>favor certain people</u>, not to <u>defraud shareholders</u>. Allen v. Admin. Review Bd., 514 F.3d 468, 480 (5th Cir. 2008) (complaints about overcharging interest to customers, delaying refunds to customers and company's use of misleading billing systems do not constitute SOX-protected "fraud against shareholders" because there must be a reasonable belief that "his or her employer acted with a mental state embracing intent to deceive, manipulate or defraud shareholders"); Andaya, 2012 WL 1871511 at *5

(complaints about employment and staffing issues, corporate waste, and improper and excessive fees are not "fraud against shareholders" because there was no "intent to deceive shareholders").[4]

\* \* \*

Diaz's gripe relates solely to the personnel that TransRe hired, the choice of a law firm that it retained, and her view of TransRe's internal policy regarding conflicts. That has nothing whatsoever to do with federal crimes and securities fraud.

Accordingly, TransRe respectfully requests that Diaz's Dodd-Frank claim be dismissed.

B.      The Breach of Contract Claim Should Be Dismissed

Diaz also asserts a claim for breach of contract based exclusively on the Code of Conduct and the TransRe Senior Officer Code (Seventh Cause of Action).

The Code of Conduct and the TransRe Senior Officer Code (which does not even apply to Diaz) state that they are merely "guides" to conduct. (Ex. B at 1) (the Code of Conduct is a "guide to your decisions" and employees "should use the Code, in conjunction with your company policies, handbooks and manuals, to guide and inform your conduct"); (Ex. C at 1) (the TransRe Senior Officer Code is "a source of guiding principles" for directors, executive officers, and senior financial officers of TransRe). The Code of Conduct also provides that the Code of Conduct and all other policies at Alleghany and its subsidiaries are "not a contract of employment" and that "[n]othing in the Code or other Alleghany policies should be construed as a promise of any kind." (Ex. B at 23.)

---

[4] While Diaz asserts that she had a "concern" about conflicts and the Code of Conduct, the Code of Conduct does not preclude the employment of relatives. See page 6 above. Moreover, there is no question that Mr. Sherman and Ms. Lombardi were not "relatives" of Ms. Levene under the Code of Conduct, and Ms. Levene's husband clearly was not employed by TransRe. See page 6 above.

It is well-settled that such codes of conduct are not employment contracts because the conversion of routinely issued manuals, handbooks and policy statements into supposedly binding employment agreements "would subject employers who have developed written policies to liability for breach of employment contracts upon the mere allegation of reliance on a particular provision." Lobosco v. N.Y. Tel. Co., 96 N.Y.2d 312, 315, 317 (2001) (dismissing employee's claim for breach of contract that was premised upon Code of Conduct's non-retaliation provision because Code of Conduct stated that it "is not a contract of employment and does not create any contractual rights of any kind"); Dellefave v. Access Temporaries, Inc., 37 F. App'x. 23, 27 (2d Cir. 2002) (same).

Indeed, here the Code of Conduct not only specifically provides that it and all other policies are not an employment contract but, unlike the code in Lobosco, the Code of Conduct also provides that it is merely a "guide" to behavior and that nothing should be construed as a promise of any kind.

TransRe respectfully requests that the breach of contract claim be dismissed.

### IV.     CONCLUSION

For the foregoing reasons, TransRe respectfully requests that the Court grant its motion to dismiss the First and Seventh Causes of action with prejudice.

Dated: New York, New York          PAUL HASTINGS LLP
April 19, 2016

By:  Marc E. Bernstein

200 Park Avenue
New York, New York 10166
(212) 318-6000
marcbernstein@paulhastings.com

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ILEANA DIAZ,<br><br>                                   Plaintiff,<br><br>vs.<br><br>TRANSATLANTIC REINSURANCE COMPANY,<br><br>                                   Defendant. | 1:16-cv-01355 (GBD)<br><br>**CERTIFICATE OF SERVICE** |

I hereby certify that on April 19, 2016, a copy of the foregoing Memorandum of Law in Support of Defendant's Motion to Dismiss was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Dated:  New York, New York
            April 19, 2016

                                                                    /s/_____
                                                                    Marc E. Bernstein